Michael CASSIDY, Robert J. Cabin, Plaintiffs–Appellants,

v.

Michael CHERTOFF, Secretary, United States Department of Homeland Security, in his official capacity, Thomas H. Collins, Admiral, Commandant, United States Coast Guard, in his official capacity, Glenn Wiltshire, Captain, United States Coast Guard Federal Maritime Security Coordinator, New York Captain–of–the–Port Zone, in his official capacity, Lake Champlain Transportation Company, Inc., in its capacity as agent of the United States Government, Defendants–Appellees.

Docket No. 05–1835–cv.

United States Court of Appeals, Second Circuit.

Argued: Oct. 27, 2005.

Final Submission: Sept. 29, 2006.

Decided: Nov. 29, 2006.

**70**

William A. Nelson, Cooperating Attorney, American Civil Liberties Union of Vermont, Middlebury, VT, for Plaintiffs–Appellants.

Douglas N. Letter, Appellate Litigation Counsel, Civil Division, Department of Justice, Washington D.C., and Michael Brow, Sylvester & Maley, Inc., Burlington, VT (Peter D. Keisler, Assistant Attorney General, Washington, D.C.; David V. Kirby, United States Attorney for the District of Vermont; Carol L. Shea, Assistant United States Attorney, Burlington, VT on the brief), for Defendants–Appellees.

Before WINTER, POOLER, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiffs-appellants Michael Cassidy and Robert J. Cabin appeal from a judgment of the United States District Court for the District of Vermont (Murtha, J.) granting defendants-appellants Michael Chertoff, Thomas H. Collins, Glenn Wiltshire, and Lake Champlain Transportation Company's ("LCT") motion to dismiss the plaintiffs' claim that LCT's practice of searching the carry-on baggage of randomly selected passengers and inspecting randomly selected vehicles, including their trunks, pursuant to the Maritime Transportation Security Act of 2002 ("MTSA"), 46 U.S.C. §§ 70101–70119 (2006), violated plaintiffs' Fourth Amendment rights. For the reasons that follow, we reject plaintiffs' contention that the searches at issue in this case violated their Fourth Amendment rights and affirm the judgment of the district court.

## BACKGROUND

In the wake of the September 11, 2001 terrorist attacks, Congress enacted the MTSA to detect and deter a potential "transportation security incident," which Congress defined as a "security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area." 46 U.S.C. § 70101(6). Because the resolution of this appeal depends, in significant part, on the MTSA and the regulations enacted pursuant to it, we begin by discussing the statutory background in some detail.

The MTSA contains a set of nationwide directives for increasing both vessel and port security. First, it requires the Secretary of the Department of Homeland Security ("DHS") to "conduct an assessment of vessel types ... on or adjacent to the waters subject to the jurisdiction of the United States to identify those vessel types ... that pose a high risk of being involved in a transportation security incident." *Id.* § 70102(a). Based on the information gathered in this initial assessment, the Secretary must then "conduct a detailed vulnerability assessment of ... [such] vessels" to identify, *inter alia*, possible threats to critical assets and infrastructure as well as existing weaknesses in passenger and cargo security protection systems. *Id.* § 70102(b). After these vulnerability assessments have been made, the MTSA requires the owners and operators of vessels "that the Secretary believes may be involved in a transportation securi-

ty incident" to prepare a security plan "for deterring a transportation incident to the maximum extent practicable." *Id.* § 70103(c)(1)-(2).

The Coast Guard conducted the initial nationwide vulnerability assessment on behalf of the Secretary. *See Implementation of National Maritime Security Initiatives,* 68 Fed.Reg. 39,240, 39,243 (July 1, 2003) (to be codified at 33 C.F.R. pts. 101, 102, 103 et al., 46 C.F.R. pts. 2, 31, 71, et al.). This assessment was aimed at "determin[ing] risks associated with specific threat scenarios against various classes of targets within the Marine Transportation System." *Id.* at 39,244. In order to determine the susceptibility of various segments of the commercial maritime community to terrorist attack, Coast Guard analysts considered, *inter alia,* the likelihood that a particular type of vessel would be a terrorist target or would be used as a weapon itself; the plausibility of terrorists actually carrying out various hypothetical attack scenarios; the risk associated with a given attack against a given target; and the likelihood and consequences of various attack scenarios. *Id.* at 39,244–45; *see also id.* at 39,243–50 (describing the methods of assessment employed by the Coast Guard in making the determinations required by the MTSA).

Based on this assessment, the Coast Guard determined that certain maritime vessels, including those that weigh more than 100 gross register tons or are licensed to carry more than 150 passengers "are at a high risk of a transportation security incident." *Id.* at 39,246; *see also* 33 C.F.R. § 104.105(a) (codifying the Coast Guard's above determination). Under the MTSA implementing regulations, vessels that fall into the high-risk category are required to adopt certain security measures to "[d]eter the unauthorized introduction of dangerous substances and devices, including any device intended to damage or destroy persons, vessels, facilities, or ports." 33 C.F.R. § 104.265(a)(1). To determine what security measures are required for such high-risk vessels, a vessel owner must prepare a Vessel Security Assessment ("VSA"), which is "an analysis that examines and evaluates the vessel and its operations taking into account possible threats, vulnerabilities, consequences, and existing protective measures, procedures and operations," *id.* § 101.105, by collecting specified background information and carrying out an onsite survey of the vessel to check existing protective measures, procedures, and operations for a variety of factors. *Id.* § 104.305(a)-(b). When complete, the VSA is used by the vehicle's owner or operator to devise a Vessel Security Plan ("VSP"), which is a "plan developed to ensure the application of security measures designed to protect the vessel and the facility that the vessel is servicing or interacting with." *Id.* § 101.105. The VSP must be submitted to the Coast Guard for review and approval. *Id.* § 104.410. Owners of a vessel operating under a VSP must "[s]creen persons, baggage (including carry-on items), personal effects, and vehicles for dangerous substances and devices at the rate specified in the approved Vessel Security Plan." *Id.* § 104.265(e)(1). Owners must also "[c]heck the identification of any person seeking to board the vessel." *Id.* § 104.265(e)(3).

Owners and operators of high-risk vessels are permitted a certain measure of flexibility within this general framework. They may opt out of "identification checks and passenger screening requirements." *Id.* § 104.292(b). In place of these search requirements, vessel owners "may ensure security measures are implemented that include":

(1) Searching selected areas prior to embarking passengers and prior to sailing; and

(2) Implementing one or more of the following:

(i) Performing routine security patrols;

(ii) Providing additional closed-circuit television to monitor passenger areas; or

(iii) Securing all non-passenger areas.

*Id.* In fact, a vessel owner or operator may, with the express permission of the Coast Guard, opt out of *any* regulatory requirement contained in a VSP so long as the Coast Guard has determined that "the waiver will not reduce the overall security of the vessel." *Id.* § 104.130 (stating that the owner or operator of a high-risk vessel is permitted to "apply for a waiver of any requirement ... that the owner or operator considers unnecessary in light of the nature or operating conditions of the vessel"). The regulations also permit owners and operators to propose an "equivalent" to any of the security measures required by a VSP. *Id.* § 104.135. Finally, instead of implementing a VSP, a vessel owner or operator may fulfill the requirements of the MTSA by implementing an Alternative Security Program ("ASP"). *Id.* § 104.140(c). An ASP is "a third-party or industry organization developed standard that the [Coast Guard] Commandant has determined provides an equivalent level of security to that established by" the agency's regulations. *Id.* § 101.105. Vessel owners and operators who adopt an ASP must still develop and make available for Coast Guard inspection a vessel-specific security assessment report. *Id.* §§ 101. 120(b)(4), 104.120. To date, the Coast Guard has approved a number of ASPs through publication in the Code of Federal Regulations, *see* 33 C.F.R. § 101.125, including the program that LCT adopted,

which was devised by the Passenger Vessel Association. *See id.* § 101.125(c).

The parties agree that an ASP is a classified document, subject to the same "sensitive security information" designation that applies to a VSP. *See id.* § 104.400(c) (stating that VSPs are subject to protection as "sensitive security information"). Because the ASP designed by the Passenger Vessel Association is classified and has not been entered into evidence, we will assume, for the purpose of reviewing the district court's decision to grant defendants' motion to dismiss, that the searches alleged by the plaintiffs are either required or permitted by LCT's security program.

Plaintiffs Michael Cassidy and Robert J. Cabin, both residents of Vermont, are commuters who ride LCT ferries and were subject to random searches pursuant to the ferry company's ASP. They traveled to their jobs in New York via the LCT ferry between Grand Isle, Vermont and Plattsburgh, New York several times a week. The ferries that operate on this route weigh more than 100 gross register tons and are therefore subject to the MTSA's regulations for high-risk vessels. Cassidy usually crosses on the ferry in his car while Cabin, who mostly commutes by bicycle, always carries with him a backpack or small bike pack.

Shortly before July 1, 2004, LCT posted a notice at its ticket booths warning passengers that "[a]s a result of the September 11, 2001, terrorist attacks on the United States," LCT had been required by DHS and the Coast Guard "to conduct random screening of persons, cargo, vehicles, or carry-on baggage." The notice further explained that compliance with the search policy was mandatory and that "anyone refusing to submit to security screening will not be allowed to board [LCT] ferries." LCT also placed large

plastic signs near its ticket booth and ferry boarding areas stating that its facilities and boats were subject to security regulations issued by DHS and the Coast Guard; that all vehicles, baggage, and personal items were subject to screening at any time; and that failure to observe these requirements could result in immediate removal from the ferry or detention by law enforcement authorities.

On July 1, 2004, LCT ferry attendants began selecting passengers to be searched. Based on observations made by plaintiffs and other witnesses, LCT's security program appears to involve the following protocols. Foot and bicycle passengers are asked to open their carry-on items and present them for visual inspection. Car passengers are asked to open their trunks or tailgates so that the attendant may visually inspect the car's interior; attendants do not appear to search containers in either the trunks or interiors of vehicles. On occasion, attendants will ask the driver to open the car's windows to permit a visual scan of the interior.

Cassidy has been asked to open the trunk of his car on a number of occasions when attempting to board the ferry. Cabin has been asked to open his bike pack on at least one occasion. Cassidy and Cabin acquiesced to these demands because commuting via LCT ferries is a practical necessity for both of them. (Cassidy stated in his complaint that the only feasible alternative—traversing Lake Champlain via Rouse's Point Bridge—would double his daily commute time from two hours to four.) Moreover, plaintiffs wish to avoid any repercussions that may attend refusal to acquiesce to LCT's boarding requirements; plaintiffs allege that LCT records the license numbers of vehicles whose drivers refuse to consent to a trunk search and communicates this information to attendants at all of its loading docks, where the offending vehicle is barred from boarding any LCT ferry until its driver submits to a search. In addition, 33 C.F.R. § 104.265(e) provides that some type of report, as required by undisclosed DHS and Coast Guard directives, must be made if a person refuses to consent to a search. Plaintiffs allege that they acquiesced to LCT's unconstitutional searches in order to avoid such repercussions.

Plaintiffs brought the instant suit on October 4, 2004, seeking injunctive and declaratory relief against defendants for Fourth Amendment violations. Defendants moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and the district court granted the motion after determining that the searches conducted by LCT "advance a 'special governmental need' to provide domestic security [and thus] are not proscribed by the Fourth Amendment." The district court explained that "Congress has determined that ferries like those which operate on Lake Champlain may be vulnerable to terrorist incidents and, therefore, should be subject to new, more comprehensive security measures designed to protect public safety and secure commercial interests." The court found that "[r]andom, warrantless searches further these goals by deterring potential security breaches," and that the searches here are reasonable because "they are conducted in a manner no more intrusive than is necessary to achieve the compelling government interest of protecting the safety of passengers and deterring terrorist attacks on maritime vessels." The court found further that the plaintiffs voluntarily elected to ride LCT ferries and consented to the required searches. The court also concluded that plaintiffs had a diminished expectation of privacy when attempting to board the ferries because such search procedures are akin to those that passengers have been accustomed to expect, and

which have been found constitutional, in the airline industry. Plaintiffs filed this timely appeal.[1]

## DISCUSSION

■ We review *de novo* a district court's grant of a motion to dismiss; we accept as true the factual allegations in the complaint and draw all inferences in the plaintiffs' favor. *Allaire Corp. v. Okumus*, 433 F.3d 248, 250–51 (2d Cir.2006).

■ Plaintiffs contend that LCT's policy of requiring passengers to submit to security checks before boarding ferries on two of its Lake Champlain routes violates their Fourth Amendment rights. The Fourth Amendment to the United States Constitution provides that the federal government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although a wholly private search falls outside the scope of the Fourth Amendment, *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), a search conducted by private individuals at the instigation of a government officer or authority constitutes a governmental search for purposes of the Fourth Amendment. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). LCT implemented its security policy in order to satisfy the requirements imposed by the MTSA and such law's implementing regulations on owners and operators of ferries that weigh over 100 gross register tons. The ASP adopted by LCT was approved by the Coast Guard—and published in the Code of Federal Regulations, 33 C.F.R. § 101.125(c)—as an adequate means of fulfilling the requirements imposed by the MTSA. The parties agree that the government's significant involvement in LCT's contested search policy brings these searches within the ambit of the Fourth Amendment.

"[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.' " *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Courts judge the reasonableness of a search "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 652–53, 115 S.Ct. 2386 (internal quotation marks omitted). When law enforcement officials undertake a search to discover evidence of criminal wrongdoing, the Supreme Court has held that reasonableness generally requires those officials to obtain a search warrant. *See Skinner*, 489 U.S. at 619, 109 S.Ct. 1402. Such warrants cannot be obtained without a showing of probable cause. *Id.*

In a limited set of circumstances, however, the Supreme Court has held that a search warrant, and the requisite showing of probable cause, are not required. A search unsupported by probable cause may be constitutional "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (internal quotation marks omitted). Indeed, the Supreme Court and this Court have upheld warrantless, suspicionless searches in a variety of circumstances in which the govern-

---

1. After oral argument, plaintiffs filed a motion for leave to file supplemental briefs regarding the impact of our decision in *Mac Wade v. Kelly*, 460 F.3d 260 (2d Cir.2006), in which a panel of this Court upheld suspicionless searches of subway passengers' carry-on baggage as constitutional. We granted the motion and the parties have submitted their supplemental briefs.

ment's actions were motivated by "special needs." *See, e.g., Illinois v. Lidster*, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (upholding highway checkpoint stops erected in the course of investigating a fatal hit-and-run accident); *Vernonia*, 515 U.S. at 650, 115 S.Ct. 2386 (upholding random drug testing by school officials of students who participate in interscholastic sports); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding highway checkpoint stops designed to detect drunk drivers); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding drug tests for United States Customs Service employees who seek transfer or promotion to certain positions and those who carry firearms); *Skinner*, 489 U.S. at 608–13, 109 S.Ct. 1402 (1989) (upholding drug and alcohol tests by railroad companies of railroad employees who are involved in train accidents or violate certain safety rules); *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upholding brief stops for questioning at a fixed Border Patrol checkpoint); *Nicholas v. Goord*, 430 F.3d 652 (2d Cir. 2005) (upholding a statute that requires certain classes of convicted felons to provide DNA samples to be maintained in a state database); *United States v. Edwards*, 498 F.2d 496 (2d Cir.1974) (Friendly, J.) (upholding suspicionless searches of the persons and carry-on luggage of all passengers seeking to board an airplane). Most recently, we upheld a random, suspicionless search regime of subway passengers' baggage as constitutional under the special needs doctrine. *MacWade v. Kelly*, 460 F.3d 260 (2d Cir.2006).

In *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the Supreme Court discussed the rubric courts must use to determine whether a particular governmental search falls within the "closely guarded category of constitutionally permissible suspicionless searches." *Id.* at 309, 117 S.Ct. 1295. The Court explained that when " 'special needs'—concerns other than crime detection or ordinary evidence gathering—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at 314, 117 S.Ct. 1295. In applying the special needs doctrine, courts must assess the constitutionality of the challenged conduct by weighing "the government conduct—in light of the special need and against the privacy interest advanced"—through the examination of three factors: (1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs. *Palmieri v. Lynch*, 392 F.3d 73, 81 (2d Cir.2004); *see also United States v. Lifshitz*, 369 F.3d 173, 183–84 (2d Cir.2004). We examine each of these three factors in turn.

## I. Plaintiffs' Privacy Interest

Plaintiffs assert that they have a full privacy interest in protecting their carry-on baggage and automobiles from random, suspicionless searches. They contend that members of the public have an undiminished expectation of privacy when they board ferries on Lake Champlain. Plaintiffs further argue that the searches LCT conducts on its loading docks differ from searches the government conducts at international borders and traffic checkpoints because borders between countries, unlike rural loading docks, are obviously sensitive locations that implicate a diminished expectation of privacy.

## A. Plaintiffs' Expectation of Privacy in Their Carry-on Baggage

■ Plaintiffs assert that passengers with carry-on baggage retain an undiminished privacy interest in such baggage because plaintiffs experienced LCT's searches as a substantial intrusion on their privacy and because *Bond v. United States*, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), "definitively reaffirmed the protected privacy interest in the contents of hand luggage." While we do not read *Bond* as broadly as plaintiffs suggest, we agree with plaintiffs that they enjoy a full expectation of privacy in their carry-on baggage.

The Supreme Court has held that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." *Vernonia*, 515 U.S. at 654, 115 S.Ct. 2386 (citations omitted). Two key cases have applied this test to passengers' carry-on luggage in the mass transport context and refused to find any diminished privacy expectations regarding such luggage. In *Bond*, the Supreme Court determined that travelers on an intracity bus enjoyed a full expectation of privacy in their carry-on items because they did not "expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner," and that expectation was objectively reasonable. 529 U.S. at 338–39, 120 S.Ct. 1462. In *Mac Wade*, we confronted the question of whether a legitimate privacy interest existed as to searches of "items in a closed, opaque bag," 460 F.3d at 272, carried by subway passengers, and found a full privacy interest in such bags, *id.* at 272–73.

It is clear that *Bond* reaffirmed the general privacy interest that individuals enjoy in relation to their bags, but we hesitate to accede to the plaintiffs' assertion that *Bond* precludes a finding of a diminished expectation of privacy in such bags in any context. Instead, as with any privacy analysis, the Supreme Court has cautioned that privacy expectations necessarily depend on context. *Vernonia*, 515 U.S. at 654, 115 S.Ct. 2386. We do, however, agree with plaintiffs that in this specific context, *MacWade* is particularly persuasive here because it concerned the privacy interests of individuals commuting on mass transportation. First, plaintiffs have clearly evinced—and the government does not deny—a subjective privacy interest in the carry-on bags that they take with them onto the ferry. *MacWade*, 460 F.3d at 272. Second, given that we found it objectively reasonable for subway riders to expect that their carry-on bags will not be "opened and [their] contents visually inspected or physically manipulated," *id.* at 273, we see little reason to alter that analysis as applied here to ferry passengers.

Finally, we are not convinced by the government's argument that our airport search cases alter the privacy interest calculus here. In *United States v. Edwards*, we upheld pre-boarding, suspicionless searches of airline passengers, holding that to brand them "as unreasonable would go beyond any fair interpretation of the Fourth Amendment." 498 F.2d at 500. But airplanes are very different creatures from the more quotidian commuting methods at issue in *MacWade* and the instant case, and society has long accepted a heightened level of security and privacy intrusion with regard to air travel. Moreover, *Edwards* did not specifically determine or discuss the privacy interest involved, and we are wary of extending its

analysis to a markedly different factual context.[2]

For the foregoing reasons, we find that the privacy interests of LCT's ferry passengers in their carry-on luggage are undiminished.[3]

### B. Plaintiffs' Expectation of Privacy in Their Automobiles

We turn now to the question of whether plaintiffs have a full privacy interest in their automobiles, including the trunks of such vehicles. It has long been recognized that "[t]he search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building." *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (internal quotation marks omitted); *see also Martinez–Fuerte*, 428 U.S. at 561, 96 S.Ct. 3074 ("[O]ne's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence."). The Supreme Court has held that "[o]ne has a lesser expectation of privacy in a motor vehicle" because it "travels public thoroughfares where its occupants and its contents are in plain view," *Cardwell*, 417 U.S. at 590, 94 S.Ct. 2464, and because the "pervasive regulation of vehicles" diminishes one's expectation of privacy in an automobile, *California*

*v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Even plaintiffs concede—and the Supreme Court has recognized—that there may be a diminished expectation of privacy regarding the part of the search that involves ferry attendants looking through car windows. *See Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (internal citations omitted)).

Plaintiffs contend, nevertheless, that they have a full privacy interest in the trunks of their cars and that LCT ferry attendants violate this interest when they ask passengers to open their trunks. Plaintiffs note that the Supreme Court has not upheld a suspicionless search regime that involved the opening and examination of motor vehicle compartments outside of the border or customs context. We are mindful, nonetheless, that the Supreme Court has stated:

> [E]ven when enclosed "repository" areas have been involved, we have concluded that the lesser expectations of privacy warrant application of the exception. We have applied the exception in the context of a locked car trunk, *Cady v. Dombrowski*, [413 U.S. 433, 442, 93 S.Ct.

---

**2.** We do not read *Mac Wade* or *Bond's* privacy analysis (nor our discussion here) to suggest that *Edwards* no longer remains good law. Indeed, the Supreme Court, we observe, has specifically noted in its special needs jurisprudence that *Edwards* is a "leading case." *Von Raab*, 489 U.S. at 675 n. 3, 109 S.Ct. 1384 (citing *Edwards* and condoning "the Federal Government's practice of requiring the search of all passengers seeking to board commercial airliners, as well as the search of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive").

**3.** Although plaintiffs contend that LCT's searches were unconstitutional, they concede that they acquiesced in the searches and did not experience any of the repercussions that might attend refusal to submit to a search. Cassidy and Cabin are therefore not representative of hypothetical plaintiffs claiming that their rights were violated as a result of their refusal to submit to LCT's searches. Our opinion does not address the constitutionality of any repercussions that might be visited upon a person who withholds consent.

2523, 37 L.Ed.2d 706 (1973) ], a sealed package in a car trunk, *United States v. Ross,* [456 U.S. 798, 806, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ], a closed compartment under the dashboard, *Chambers v. Maroney,* [399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ], the interior of a vehicle's upholstery, *Carroll v. United States,* [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ], or sealed packages inside a covered pickup truck, *United States v. Johns,* 469 U.S. 478 [105 S.Ct. 881, 83 L.Ed.2d 890] (1985). *Carney,* 471 U.S. at 391–92, 105 S.Ct. 2066. While the above-cited cases involved warrantless searches where probable cause existed, the Court clearly found an exception to the warrant requirement because of the lesser expectations of privacy attendant to automobiles. This would suggest that the vehicle owners might also have diminished privacy interests in their vehicles' trunks, in the narrow factual context presented in the instant case, where randomly selected automobile drivers, who seek to board a ferry, are simply asked to open their trunks briefly for security purposes.

It is clear that there are significant questions here regarding the level of the privacy interest implicated in trunk searches. Given that we have already found an undiminished privacy interest in plaintiffs' carry-on baggage, the government will have to demonstrate that the other two factors of the special needs analysis outweigh plaintiffs' privacy interests to establish the constitutionality of its searches. Thus, regardless of how we resolve the issue of the expectation of privacy in the plaintiffs' automobile trunks, the government must overcome the full privacy expectations plaintiffs enjoy in their carry-on bags here. Accordingly, we need not reach the privacy expectation plaintiffs possess in the trunks of their motor vehicles and will assume but expressly not hold that plaintiffs have demonstrated that they enjoy a full expectation of privacy in their vehicles' trunks.[4]

## II. The Character and Degree of the Governmental Intrusion

■ Because an undiminished privacy interest is not itself dispositive in special needs cases but is merely one among three factors to be weighed, *MacWade,* 460 F.3d at 272, we must next examine the screening at issue and determine whether searches, which consist of random visual inspections by ferry attendants of vehicles' trunks as well as the carry-on baggage of bicyclists and pedestrians, are minimally or substantially intrusive. In making this examination, courts have looked to various factors, including, *inter alia,* the duration of the search or stop, *see Lidster,* 540 U.S. at 427, 124 S.Ct. 885; *Sitz,* 496 U.S. at 451–52, 110 S.Ct. 2481; *Martinez–Fuerte,* 428 U.S. at 546–47, 558, 96 S.Ct. 3074, the manner in which government agents determine which individuals to search, *see Lidster,* 540 U.S. at 428, 124 S.Ct. 885, *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. 3074, the notice given to individuals that they are subject to search and the oppor-

---

4. Given the very narrow circumstances here—where a motor vehicle's trunk is searched as part of a government-instituted anti-terrorism search regime before that vehicle itself is boarded onto a ferry—we are not presented with, and need not address, the potentially more troublesome question of the constitutionality of a similar search that occurs, for instance, on a highway.

Finally, plaintiffs' briefs focus on the searches of carry-on bags and motor vehicles' trunks. To the extent that their complaint can be read to challenge the visual inspection of a vehicle's interior through its windows, the parties do not appear to dispute that, as we noted above, there is a diminished expectation of privacy in that context. This does not alter our analysis of the searches' constitutionality.

tunity to avoid the search by exiting the premises, *see Mac Wade*, 460 F.3d at 273; *Edwards*, 498 F.2d at 500, as well as the methods employed in the search, *see Sitz*, 496 U.S. at 451, 110 S.Ct. 2481; *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074.

■ On the basis of these factors, it is clear that the searches in this case are, by any measure, minimally intrusive. As recounted by plaintiffs, the duration of the stops or searches have been "cursory" and of the short duration which the Supreme Court has long held to be minimally intrusive. *Lidster*, 540 U.S. at 427, 124 S.Ct. 885 (upholding brief stops of vehicles at checkpoint and questioning of drivers); *Sitz*, 496 U.S. at 451, 110 S.Ct. 2481 (same); *Martinez–Fuerte*, 428 U.S. at 546–47, 558, 96 S.Ct. 3074 (same). Plaintiffs have not alleged that the government has given unbridled discretion to LCT employees to carry out searches in a discriminatory or arbitrary manner. *Lidster*, 540 U.S. at 428, 124 S.Ct. 885 ("[T]here is no allegation here that the police acted in a discriminatory or otherwise unlawful manner while questioning motorists during stops."); *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. 3074 (discussing the intrusiveness of roving patrols that presented "a grave danger [of] unreviewable discretion," but finding that a fixed checkpoint greatly reduced the possibility of abuse). Other factors similarly weigh in the government's favor in this inquiry. For instance, the methods used to conduct the searches at issue are limited to visual inspections of vehicles and their trunks and brief examinations of the contents of carry-on baggage. *See Sitz*, 496 U.S. at 451, 110 S.Ct. 2481 (brief visual inspections); *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074 (same); *Edwards*, 498 F.2d at 500 (brief examination of contents of carry-on luggage).[5] Ample notice is given to individuals seeking to board LCT ferries that they are subject to search and that they may avoid the search by exiting the premises. *See MacWade*, 460 F.3d at 273 ("[P]assengers receive notice of the searches and may decline to be searched so long as they leave the subway...."); *Edwards*, 498 F.2d at 499–500 (finding notice central to upholding the constitutionality of airport searches where large signs had been posted near the boarding gates warning: "PASSENGERS AND BAGGAGE SUBJECT TO SEARCH"). Such notice helps "reduc[e] to a minimum any unsettling show of authority that may be associated with unexpected intrusions on privacy." *Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. 1384 (internal citation and quotation marks omitted); *see also Edwards*, 498 F.2d at 501 ("The point is ... that in order to bring itself within the test of reasonableness applicable to airport searches, the Government must give the citizen fair warning, before he enters the area of search, that he is at liberty to

---

**5.** Plaintiffs contend that the intrusions on their privacy cannot be considered minimal because "[t]he Fourth Amendment privacy interest has a subjective as well [as] an objective component," and they found them subjectively intrusive. In support of this proposition, they cite Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Justice Harlan stated in *Katz* that in determining the nature of a search and seizure under the Fourth Amendment, courts require "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring). This analysis, however, is not relevant here to the nature of the intrusion but rather to the privacy interest involved—an analysis that we have already completed. Furthermore, to apply that test here would essentially collapse two of the factors in the special needs analysis into one by making both the privacy interest and the degree of the intrusion into the same question.

proceed no further."). Notice also serves to eliminate any stigma associated with the search. *Id.* at 500 ("The search of carry-on baggage, applied to everyone, involves not the slightest stigma. More than a million Americans subject themselves to it daily . . . .") (internal citation omitted).

Plaintiffs argue that the searches in the above cases are inapposite because they did not involve opening trunks. The drivers brought to the "secondary inspection area" in *Martinez–Fuerte* for more intense questioning of their residency status were, however, almost certainly subjected to a greater intrusion of their privacy than the ferry passengers who have to open their trunks for a brief visual inspection by a ferry attendant. 428 U.S. at 547, 96 S.Ct. 3074 (upholding brief questioning in a "secondary inspection area" which lasted on average between three and five minutes). And even if the intrusions in this case were more significant than those in the Supreme Court's checkpoint cases, they are certainly less intrusive than the search at issue in *Edwards.* In *Edwards,* we found pre-boarding baggage searches at airports to be minimally intrusive, even when a Deputy United States Marshal searched a woman's bag, found a package with a pair of slacks wrapped around it, removed the slacks, and looked inside the package. 498 F.2d at 499–500; *see also MacWade,* 460 F.3d at 273 (holding that random searches of subway passengers' carry-on bags,

which include the visual inspection of the contents of such bags, to be minimal).

■ Nor does plaintiffs' assertion that magnetometer searches are less intrusive than visual searches alter the fact that the level of intrusion visited on the plaintiffs in this case was minimal. The Supreme Court has "repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means" to accomplish the government's ends. *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 837, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); *see also Vernonia,* 515 U.S. at 663, 115 S.Ct. 2386; *Skinner,* 489 U.S. at 629 n. 9, 109 S.Ct. 1402. Thus, what matters in this case is not whether the defendants could have satisfied the requirements of the MTSA by devising a less intrusive means of searching passengers, but whether the means they chose unconstitutionally trenched on plaintiffs' privacy interests in an unreasonable way. As our decision today makes clear, we cannot say, after having balanced the "special needs" factors, that plaintiffs' Fourth Amendment rights have been violated.[6]

Finally, plaintiffs make a slippery-slope argument, claiming that because the threat of terrorism is omnipresent, there is no clear limit to the government power to conduct suspicionless searches. This is a legitimate concern. As we discuss in the next section, however, it is not a concern

---

6. Plaintiffs take issue with the fact that the MTSA allowed LCT to implement the ASP designed by the Passenger Vessel Association that imposed relatively little cost on the ferry company when the company could instead have adopted other less intrusive, but more costly security measures. That LCT took cost into account in determining how to fulfill the requirements of the MTSA does not in and of itself render LCT's policy constitutionally suspect. All governmental search procedures, whether conducted by the government or by a private entity at the instigation of the govern-

ment, take cost into account. An inexpensive search policy, like any search policy, runs afoul of the Fourth Amendment only insofar as it is unreasonable. Similarly, it is clear that a private entity, empowered by the government to conduct a search, need not choose the least restrictive means to avoid a violation of the Fourth Amendment. *See, e.g., Skinner,* 489 U.S. at 611, 625–27, 109 S.Ct. 1402 (finding no constitutional violation where a private entity was granted substantial discretion by statute to conduct breath and urine tests on certain employees).

implicated by the facts in this case, where the government has imposed security requirements only on the nation's largest ferries after making extensive findings about the risk these vessels present in relation to terrorism and, as noted, the scope of the searches is rather limited. Having thus found that the visual inspection of vehicles and their trunks along with the search of carry-on baggage at issue here are minimally intrusive, we weigh this factor in the government's favor.

## III. The Government's Special Needs and the Efficacy of the Searches

### A. The Government's Special Need

■ Our next task in the special needs analysis requires us to determine the "nature and immediacy of the governmental concern at issue here." *Vernonia*, 515 U.S. at 660, 115 S.Ct. 2386. The Supreme Court has cautioned that the government's asserted special need must "describe[ ] an interest that appears *important enough* to justify the particular search at hand," *id.* at 661, 115 S.Ct. 2386, and we have expressly mandated that "a close and substantial relationship" exist between the degree of intrusiveness and the governmental need asserted, *Lifshitz*, 369 F.3d at 184, 186.

The Supreme Court has indeed "been reluctant to ratify implausible or overbroad assertions of 'special needs.'" *Id.* at 185, 369 F.3d 173. In *Chandler v. Miller*, for example, the Court struck down a drug testing regime imposed upon candidates for state office in Georgia because it found that "the proffered special need for drug testing" was not substantial where Georgia "assert[ed] no evidence of a drug problem among the State's elected officials, [and] those officials typically do not perform high-risk, safety-sensitive tasks." 520 U.S. at 318, 322, 117 S.Ct. 1295. The Court concluded that the government's asserted

need was merely "symbolic, not 'special.'" *Id.* at 322, 117 S.Ct. 1295.

The Court has also emphasized that the government's asserted "special need" must not be isomorphic with law enforcement needs, but rather go beyond them. *See, e.g., Ferguson v. City of Charleston*, 532 U.S. 67, 80, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (striking down a public hospital's policy of ordering drug screens for maternity patients suspected of cocaine use because "the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment"); *City of Indianapolis v. Edmond*, 531 U.S. 32, 42, 47, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (invalidating an Indianapolis drug checkpoint program because its "primary purpose" was "to uncover evidence of ordinary criminal wrongdoing," and noting that, "[w]hile reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs ... cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue"). The Court differentiated the drug checkpoint in *Edmond* from the immigration checkpoint in *Martinez–Fuerte* by emphasizing the difficulty of effectively containing illegal immigration at the border and noting that this problem was distinct from, and went beyond, regular law enforcement needs. *See Edmond*, 531 U.S. at 38–39, 121 S.Ct. 447.

Plaintiffs make three principal arguments that the searches at issue here do not constitute a special need under our caselaw. They first argue that the special needs doctrine only applies where those searched comprise a "well-defined target class." They next contend that the government has proffered only an abstract, unsubstantiated need that does not justify the searches at issue. Finally, plaintiffs

assert that this Court should not defer to the Coast Guard's determinations of the terrorism risk in deciding this case. We discuss each argument in turn.

### 1. The Special Needs Doctrine Does Not Require a "Well–Defined Target Class."

■ As a threshold matter, plaintiffs contend that this case does not involve "special needs" because LCT's search policy is not aimed at a "well-defined target class." Although it is true that some "special needs" searches target well-defined groups—i.e., high school students who participate in competitive extracurricular activities, *see Earls,* 536 U.S. at 825, 122 S.Ct. 2559, or a particular group of United States Customs Service employees, *see Von Raab,* 489 U.S. at 659, 109 S.Ct. 1384—neither the Supreme Court nor this Court has ever held that a "well-defined target class" is a requisite showing in a "special needs" case. In fact, the baggage screening and checkpoint cases make it clear that such targeting is not required in order for the government to establish a "special need." *See, e.g., Sitz,* 496 U.S. at 455, 110 S.Ct. 2481 (permitting sobriety checkpoints); *Martinez–Fuerte,* 428 U.S. at 561–64, 96 S.Ct. 3074 (permitting immigration-control checkpoints); *MacWade,* 460 F.3d at 275 (permitting random, suspicionless searches at subway stations); *Edwards,* 498 F.2d at 499–500 (permitting pre-boarding baggage inspection at airports). This argument is without merit.

### 2. The Government Has Demonstrated a "Special Need."

■ Plaintiffs further contend that defendants have adduced only an "abstract or general" need to justify the implementation of searches aboard the Lake Champlain ferries and that is insufficient to excuse the invasion of their privacy.

It is clear to the Court that the prevention of terrorist attacks on large vessels engaged in mass transportation and determined by the Coast Guard to be at heightened risk of attack constitutes a "special need." Preventing or deterring large-scale terrorist attacks present problems that are distinct from standard law enforcement needs and indeed go well beyond them. *See MacWade,* 460 F.3d at 272 ("[P]reventing a terrorist from bombing the subways constitutes a special need that is distinct from ordinary post hoc criminal investigation."); *Nicholas,* 430 F.3d at 661 (explaining that "[w]hat unifies [the Supreme Court's "special needs"] cases, despite their varied contexts, is that in each instance, the Court found that the suspicionless-search regime at issue served some special need distinct from normal law-enforcement needs"). There is also an obvious nexus between protecting a ferry and guarding against the threat of terrorism through minimally intrusive searches of vehicles and carry-on baggage. Indeed, as in the case of airline hijacking, a large ferry commandeered by a terrorist becomes a weapon, or as in the case of subway bombing, the ferry becomes a death trap. Either way, the government has a "special need" to prevent such potentially disastrous situations from developing, and courts have readily acknowledged the special government need in protecting citizens in the mass transportation context. *See, e.g., Skinner,* 489 U.S. at 608–13, 109 S.Ct. 1402 (testing railroad employees for drugs and alcohol when safety incidents occur); *MacWade,* 460 F.3d at 271–72; *United States v. Hartwell,* 436 F.3d 174, 179 (3d Cir.2006) (Alito, J.) (pre-boarding search of airline passengers' carry-on baggage); *Edwards,* 498 F.2d at 500 (same); *United States v. Davis,* 482 F.2d 893, 910 (9th Cir.1973) (same).

■ Plaintiffs contend that even if the government has a "special need" to protect large ferries in major metropolitan areas, it does not have a "special need" to protect the ferries on Lake Champlain, where there is no obvious terrorist threat. The Supreme Court, however, has held that the government need not adduce a specific threat in order to demonstrate a "special need." *See Earls*, 536 U.S. at 835–36, 122 S.Ct. 2559 (noting that "this Court has not required a particularized or pervasive . . . problem [to occur] before allowing the government to conduct" suspicionless searches where there is a real threat of substantial harm to society). In *Von Raab*, the Court pointed to the federal government's practice of requiring the search of all airline passengers seeking to board commercial airlines as an illustration of this point. The *Von Raab* Court quoted approvingly the following passage in Judge Friendly's opinion in *Edwards:*

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, that danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air. *United States v. Edwards*, 498 F.2d 496, 500 (2d Cir.1974) (emphasis in original).

*Von Raab*, 489 U.S. at 675 n. 3, 109 S.Ct. 1384. The Von Raab Court then noted that although airline searches "were adopted in response to an observable national and international hijacking crisis," the Court would not suppose that, if the validity of these searches be conceded, the Government would be precluded from conducting them absent a demonstration of danger as to any particular airport or airline. *It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context.*

*Id.* (emphasis added). Although the plaintiffs may be correct that Lake Champlain ferries are a less obvious terrorist target than ferries in, for example, New York City or Los Angeles, the airline cases make it clear that the government, in its attempt to counteract the threat of terrorism, need not show that every airport or every ferry terminal is threatened by terrorism in order to implement a nationwide security policy that includes suspicionless searches.

As the Supreme Court noted in *Von Raab:* If the government has determined that airports fall into a high-risk category and require special protection from terrorist attack, it does not matter whether a regional airport in a small city is perceived to be less susceptible to attack than an international airport in a major city. *See id.* at 675 n. 3, 109 S.Ct. 1384. Here, the Coast Guard, pursuant to a Congressional directive, conducted a risk analysis to determine which vessels "pose a high risk of being involved in a transportation security incident." 46 U.S.C. § 70102(a). This analysis involved various factors, including the susceptibility of various segments of the commercial maritime industry as targets and as weapons themselves, the plausibility of a terrorist actually carrying out the various attack scenarios contemplated, the risk associated with a given attack against a given target, the likelihood of various attack scenarios, and the consequences of various attack scenarios. *See* 68 Fed.Reg. at 39,243–50. Based on this assessment, the Coast Guard concluded that vessels weighing over 100 gross register tons "are at a high risk of being in-

volved in a transportation security incident" and should therefore be subject to the regulations at issue in this case. *Id.* at 39,246. Whether these large vessels dock at urban or rural ports is therefore beside the point; the government need not demonstrate the existence of a specific danger to a particular port or ferry in order to establish a special governmental need justifying suspicionless searches of ferry passengers.

### 3. The Government's Determinations of "High Risk" Are Entitled to Deference.

■ Expert determinations by the Coast Guard, like the one discussed above, which are based on an explicit Congressional delegation of legislative authority (in this case, 46 U.S.C. §§ 70102(a), 70103(c)(1)-(2)) are entitled to significant deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (deference appropriate where Congress expressly delegated authority to agency to "elucidate a specific provision of the statute by regulation"). Plaintiffs argue that deference is not due in this case because LCT's security plan was submitted only to the regional Coast Guard authority and thus does not constitute the sort of agency action entitled to deference. In support of this proposition, plaintiffs cite *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). At issue in *Mead* were a statute providing that the United States Customs Service should prescribe rules establishing procedures for the issuance of tariff classification rulings, and regulations promulgated by Customs providing for tariff rulings via "ruling letters" that set tariff classifications for particular imports. *Id.* at 221–22, 121 S.Ct. 2164. Under the regulations, any of the forty-six port-of-entry Customs offices could issue ruling letters.

*Id.* at 224, 121 S.Ct. 2164. The *Mead* Court held that a tariff classification ruling by the United States Customs Service was not entitled to *Chevron* deference because "the terms of the congressional delegation give no indication that Congress meant to delegate authority to Customs to issue classification rulings with the force of law." *Id.* at 231–32, 121 S.Ct. 2164. The Court further held that "the agency practice itself [gave no] indication that Customs ever set out with a lawmaking pretense in mind when it undertook to make classifications like these. . . . Indeed, to claim that classifications have legal force is to ignore the reality that 46 different Customs offices issue 10,000 to 15,000 of them each year." *Id.* at 233, 121 S.Ct. 2164.

It is clear that the Coast Guard is entitled to deference on its determinations that 100–ton vessels are at "high risk" of terrorist attack; even plaintiffs acknowledge as much. They instead seek to analogize the instant case to *Mead* by suggesting that the ASP under which LCT operates is akin to a tariff classification ruling made by a local Customs office. *Mead,* however, is inapposite to the instant case. Here, the Coast Guard was acting under an explicit congressional delegation of legislative authority when it determined that increased security was required on the nation's largest ferries, and the regulations it devised were clearly intended to have the force of law. The MTSA requires the owners and operators of specified maritime vessels to implement a Coast–Guard approved security plan. ASPs, such as the one implemented by LCT, are approved at a national level by the Coast Guard Commandant if he or she finds that they provide a level of security equivalent to that established by the agency's regulations. 33 C.F.R. §§ 101–105. To date, the Coast Guard has approved

only a few ASPs, including the Passenger Vessel Association program adopted by LCT. *Id.* § 101.125(c). Thus, contrary to the plaintiff's suggestion, LCT's ASP bears little resemblance to the thousands of tariff classification rulings issued by dozens of local Customs offices each year, and we owe significant deference to the Coast Guard's determination that ferries weighing over 100 gross register tons fall into a high-risk category.

Finally, even were we to accept plaintiffs' reading of *Mead*, it is unclear exactly what portion of our analysis here would change. The "high risk" designation, as we have already held, applies to LCT ferries on Lake Champlain as much as it does to the Staten Island Ferry. Plaintiffs are thus left to challenge the ASP, but it is simply a detailed plan of the security procedures that LCT has implemented to comply with the MTSA. As this opinion makes clear, we have not deferred to the government in examining the searches as authorized by the ASP, but have analyzed *de novo* the constitutional privacy interests involved as well as the nature of the government's intrusion. Given this scrutiny, plaintiffs' challenge here would still fail were we to follow their application of *Mead*. We accordingly find that the government has proffered an important, even compelling, special need here, having determined that ferries such as the ones operated by LCT are at a high risk of terrorist attack.

### B. The Efficacy of the Searches

 We now conclude the special needs analysis by examining the efficacy of the searches at issue here. We are mindful that the requirement that a court assess the efficacy of challenged searches and seizures in a "special needs" case is "not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternatives law enforcement techniques should be employed to deal with a serious public danger.... [T]he choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and responsibility for, limited public resources." *Sitz*, 496 U.S. at 453–54, 110 S.Ct. 2481; *see also Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir.2000) ("[T]he effectiveness inquiry involves only the question whether the [search] is a 'reasonable method of deterring the prohibited conduct;' the test does not require that the [search] be 'the most effective measure.'") (quoting *Maxwell v. City of New York*, 102 F.3d 664, 667 (2d Cir.1996)). In this case, the government determined that the ASP devised by the Passenger Vessel Association and adopted by LCT was a reasonable means of fulfilling the requirements of the MTSA. Thus, our task is to determine not whether LCT's ASP was optimally effective, but whether it was reasonably so.[7]

Congress made clear in the MTSA that the central purpose of random security screening on high-risk maritime vessels is to "deter[ ] a transportation security incident," 46 U.S.C. § 70103(a). The Secretary then determined that the statutory purpose would be served by "[d]eter[ring] the unauthorized introduction of danger-

---

7. LCT's security measures were probably not optimally effective. As plaintiffs note, LCT's search policy applies to carry-on baggage, but not baggage stored in cars, and exempts tractor trailer trucks from search altogether. Furthermore, LCT's policy allows passengers to board the ferry with knives and guns, which may increase the risk that the ferry will be hijacked. Our task, however, is to determine not whether we could devise a superior plan, but whether LCT's security policy was reasonably effective in accomplishing its goals.

ous substances and devices" onto such vessels. 33 C.F.R. § 104.265(a)(1). When evaluated in this context, the ASP adopted by LCT appears to be reasonably calculated to serve its goal of deterring potential terrorists because "[i]t provides a gauntlet, random as it is, that persons bent on mischief must traverse." *United States v. Green*, 293 F.3d 855, 862 (5th Cir.2002); *see also id.* (finding that a military base commander's decision that stopping every sixth car can be effective at preventing terrorism or keeping the roads and personnel of the installation safe from unlicensed drivers was "common sense" because it preserved scarce governmental resources and deterred individuals from attacking the base); *cf. Von Raab*, 489 U.S. at 675 n. 3, 109 S.Ct. 1384 ("Nor would we think, *in view of the obvious deterrent purpose of these searches,* that the validity of the Government's airport screening program necessarily turns on whether significant numbers of putative air pirates are actually discovered by the searches conducted under the program.") (emphasis added); *Davis*, 482 F.2d at 908 (purpose of airport screening is deterrence). Indeed, in *MacWade*, we expressly observed that deterrence "need not be reduced to a quotient before a court may recognize a search program as effective." 460 F.3d at 274.

Plaintiffs contend, however, that the government cannot intrude on privacy rights merely for symbolic purposes. In support of this argument, plaintiffs cite the Supreme Court's holding in *Chandler v. Miller,* that suspicionless drug testing of candidates for state office cannot be justified by the government's desire to communicate a message that "the candidates, if elected, would be fit to serve their constituents free from the influence of illegal drugs." 520 U.S. at 321, 117 S.Ct. 1295. The *Chandler* Court found that Georgia had not shown that candidates for state

office were engaged in drug abuse and that a merely symbolic purpose that did not address an actual need could not justify a nontrivial invasion of privacy. Here, by contrast, the government is not seeking to convey a message that it disapproves of terrorism, but rather to deter an actual terrorist attack on a vessel that the Coast Guard has determined to be at an elevated risk of such attack. Unfortunately, the government's efforts to prevent terrorism in this case are not merely symbolic.

Plaintiffs further contend that the screening policy at issue in this case is not reasonably calculated to further Congress's aim of deterring a terrorist attack because it is not sufficiently thorough. The Supreme Court has been skeptical of challenges to the constitutionality of searches under the Fourth Amendment that suggest that a security policy's randomness or insufficient thoroughness contributes to its constitutional deficiencies:

> [P]etitioners' objection is based on those features of the ... program ... that contribute significantly to diminish the program's intrusion on privacy.... Thus, under petitioners' view, the testing program would be more likely to be constitutional if it were more pervasive and more invasive of privacy.

*Von Raab*, 489 U.S. at 676 n. 4, 109 S.Ct. 1384 (citations and internal quotation marks omitted). In this case, Congress directed the Coast Guard to identify vessel types posing a high risk of being involved in a terrorist attack. 46 U.S.C. § 70102(a). The Coast Guard was then charged with implementing the statutory directive to "establish[ ] and maintain[ ] physical security [and] passenger and cargo security." *Id.* § 70103(c)(3)(C). Although the security policy implemented by LCT may not be maximally effective in preventing terrorist attacks on its ferries, it is minimally intrusive, and we cannot

say, particularly in light of the deference we owe to the Coast Guard, that it does not constitute a "reasonable method of deterring the prohibited conduct." *Mollica*, 229 F.3d at 370 (internal quotation marks omitted). Indeed, "[a]n unexpected change of plans," resulting from "a would-be bomber declin[ing] a search" may "well stymie an attack, disrupt the synchronicity of multiple bombings, or at least reduce casualties." *MacWade*, 460 F.3d at 275.

Having determined that LCT's practice of searching carry-on baggage and vehicles of randomly selected passengers is justified by a special governmental need and that such searches are a reasonable method to discourage prohibited conduct, we weigh this factor heavily in the government's favor.

## CONCLUSION

While plaintiffs enjoy undiminished privacy expectations in their carry-on baggage and we presume such undiminished expectation in the trunks of their vehicles, we find that the remaining two factors under the "special needs" doctrine weigh heavily in the government's favor. Indeed, given that both the intrusions on plaintiffs' privacy interests are minimal and the measures adopted by LCT are reasonably efficacious in serving the government's undisputedly important special need to protect ferry passengers and crew from terrorist acts, we find no constitutional violation. Accordingly, we affirm the district court's judgment granting defendants' motion to dismiss.