# Kittatinny Canoes, Inc. v. Westfall Township

*Cletus P. Lyman*, for plaintiffs.
*Robert F. Bernathy*, for defendant.

MARK, *J.*, May 6, 2013—On April 8, 2013, we entered an order granting the motion of plaintiffs Kittatiny Canoes, Inc. ("Kittatiny") and Indian Head Canoes, Inc. ("Indian Head") (collectively "plaintiffs") for a preliminary injunction prohibiting defendant Westfall Township

("defendant" or the "township") from enforcing its newly-enacted amusement tax against them for amusements or activities conducted on the Delaware River. In the order, we indicated that this opinion would follow. We now present our reasons for granting plaintiffs' motion.

Factual and Procedural Background

On December 4, 2012, pursuant to the Local Tax Enabling Act,[1] defendant, a second class township, adopted an Amusement Tax Ordinance[2] ("Amusement Tax" or "ordinance"), effective January 4, 2013. The purpose of the Amusement Tax is "to increase general revenues within the Township for the purposes of providing residents with essential services." (Ordinance, §3). Under the ordinance, a one percent levy[3] is placed on admissions charged, or the gross amount collected where no fixed admission is charged, to any amusement within the township. The ordinance defines an "amusement," in pertinent part, as:

All manor and forms of entertainment, subject to tax as set forth in the Local Tax Enabling Act, including, but not limited to, theatrical performances, concerts, circus's [sic], carnivals, side shows, all forms of entertainment at fair grounds and amusement parks, floor shows, dance exhibitions, trade shows, craft shows, art show [sic] and exhibitions, sporting events, any and all forms of live entertainment, and all other diversion, sport, recreation or past time for which admissions charges are obtained from the general public or a limited or selected number thereof, directly or indirectly.

(*Id.* at §4(b)). "Admission" is defined as a "monetary

1. 53 P.S. §§6924.101, 6924.301 *et seq.*
2. Westfall Township Ordinance No. 158 (December 4, 2012).
3. Under the Local Tax Enabling Act, the Amusement Tax may be increased up to ten percent. 53 P.S. §6924.311(6).

charge of any character whatsoever...charged or paid by persons for the privilege of attending or engaging in amusements." (*Id.* at §4(a)). The ordinance places the burden of collecting the Amusement Tax on "producers," who are "any person or association ... conducting any place of amusement" within Westfall Township. (*Id.* at §§4(f), 7(a)). The parties agree that plaintiffs are "producers" as defined under the ordinance. (Stipulation of facts, March 20, 2013, ¶3.)

Kittatinny and Indian Head are separate, unrelated corporate entities, each of which conducts business in the township. Kittatinny is a Pennsylvania corporation with a corporate address in Dingmans Ferry, Pennsylvania. It has two business locations within the township. Indian Head is a New Jersey corporation that is registered and authorized to do business in Pennsylvania with a mailing address in Matamoras, Pennsylvania. It has one business location in the township and two business locations in New York.

Kittatinny and Indian Head each operate a canoe livery. They charge patrons varying amounts to rent canoes, rafts, kayaks, tubes and other watercraft for use on the Delaware River. The amount charged depends on the type of watercraft rented and the number of persons. (Stipulation of facts, March 20, 2013, ¶8.) Most of plaintiffs' customers pay their admission at plaintiffs' respective business locations in Westfall Township before they are taken by van to launch points upstream in New York and end their trip in Westfall Township. Some of plaintiffs' customers begin their trip in Westfall Township and disembark in the Delaware Water Gap on the New Jersey side of the river. Plaintiffs' operations are seasonal and usually open each year at some point in April. Kittatinny expects approximately 10,000 customers to rent the various watercraft this year, while Indian Head expects approximately 5,000 customers.

After the Amusement Tax became effective, but before they had commenced operations for the 2013 season, plaintiffs jointly filed a complaint seeking declaratory and injunctive relief and a motion for a preliminary injunction. Plaintiffs sought a declaration that, as applied to them and their operations on the Delaware River, the ordinance is unconstitutional and preempted by federal law. They also sought a preliminary injunction enjoining the township from enforcing the Amusement Tax against them. Defendant responded by filing preliminary objections.

After these pleadings were filed, we held a scheduling conference with counsel for all parties. An expedited briefing schedule was established and a hearing was scheduled to hear argument on defendant's preliminary objections and, if necessary, evidence and arguments on plaintiff's motion for preliminary injunction.

Plaintiffs and defendant filed pre-hearing briefs and the hearing was convened, as scheduled, on March 20, 2013. Following argument, we overruled the preliminary objections. We then heard evidence and argument on plaintiffs' request for a preliminary injunction. The parties were given eight days to submit supplemental briefs addressing specific questions posed by the court and any other relevant issues they wished to discuss. The parties filed briefs as directed. Thereafter, based on the pleadings, the evidence presented at hearing, the oral and written arguments of the parties, and the applicable law, we issued the order granting the preliminary injunction.

## Discussion

The party seeking injunctive relief bears the burden of establishing the essential prerequisites necessary for the grant of such relief. These essential prerequisites require a party to demonstrate the following:

(1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

(2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings;

(3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;

(4) that the activity it seeks to restrain is actionable, its right to relief is clear and the wrong is manifest, or, in other words, that it is likely to prevail on the merits;

(5) that the injunction it seeks is reasonably suited to abate the offending activity; and

(6) that a preliminary injunction will not adversely affect the public interest.

*Free Speech, LLC v. City of Philadelphia,* 884 A.2d 966, 970 (Pa. Cmwlth. 2005).

While the moving party must demonstrate all six of the above elements in order to obtain a preliminary injunction, the parties agreed at hearing that only two are truly in dispute in this case: 1) whether plaintiffs have an adequate remedy at law; and 2) whether plaintiffs are likely to prevail on the merits. In the interest of completeness, we will first briefly discuss the other four elements. We will then extensively discuss the issues raised by the parties in the context of the two disputed requirements.

As to the greater injury prong, there is little question that plaintiffs would suffer economic injury, from administrative costs to the remittance of the collected

monies to the potential loss of business, if required to pay the Amusement Tax. Defendant, meanwhile, would not suffer substantial harm because, as this tax is new and has never been collected from plaintiffs or their customers before, defendant would suffer no loss of revenue. Similarly, the grant of the injunction would leave the parties in exactly the same position as they were before enactment of the Amusement Tax. Plaintiffs' would not be required to pay and plaintiffs would not be required to account for and remit a tax they have never paid or remitted before, and defendant would not collect a tax it has never collected from plaintiffs before. Additionally, but in the same vein, the bond we set protects the township coffers. Further, the injunction is aimed only at preventing defendant from collecting the tax from plaintiffs' operations on or in the Delaware River, not any other producers conducting amusements and not plaintiffs conducting amusements, now or in the future, that do not take place on the Delaware. Plaintiffs seek no more, and an injunction is a reasonable measure to abate application of a tax under circumstances where, as discussed below, there has been a strong showing that the tax, as applied to plaintiffs and their customers, is preempted and may not be collected. Finally, the injunction will not harm the public interest because no taxes had been or will be collected from plaintiffs, and therefore, no essential services will lose any funding they had previously relied on.

### Irreparable Harm and Adequate Remedy at Law

Initially, plaintiffs contend that, because defendant does not have the authority to levy the Amusement Tax, they do not need to demonstrate they will suffer irreparable harm or that they have no adequate remedy at law. Additionally, and alternatively, plaintiffs assert that, because any taxes collected would be turned over to defendant's tax collector and would then have to be returned to the customers and

not plaintiffs, an action for a refund is an inadequate legal remedy and they have no other adequate remedies at law. And, according to plaintiffs, "[e]quity should exercise its jurisdiction where meaningful review by other means is impractical." (Pl.'s' supplemental br. at 4.)

Defendant responds by arguing that plaintiffs are not exempt from establishing, and in any event cannot demonstrate, that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Specifically, defendant contends that plaintiffs presented no evidence at hearing that rose to the level of irreparable harm, and there is no possible harm in this situation that cannot be compensated with damages. Additionally, defendant argues that Kittatinny cannot prove it has a clear right to relief as it a Pennsylvania corporation that only does business on the Pennsylvania side of the Delaware River.

In reaching our decision, we carefully considered all arguments of the parties. While we did not agree with all aspects of plaintiffs' arguments, and similarly do not accept all of the premises on which their arguments are based, we did agree and find that plaintiffs had established the requisite level of harm and the lack of an adequate legal remedy.

Initially, we did not agree with plaintiffs assertion that they are not required to demonstrate they will suffer irreparable harm or that they have no adequate remedy at law. In support of this contention, plaintiffs cited numerous decisions in which injunctions were issued or upheld without discussion of irreparable harm or the adequacy of legal remedies in cases where the taxing authority lacked the power to levy the particular tax at issue. For example, plaintiffs cited *Jamison Coal & Coke Co. v. School Dist. of Unity Twp.*, 66 A.2d 759 (Pa. 1949),

in which the Pennsylvania Supreme Court upheld an injunction, without addressing whether the plaintiff would be irreparably harmed or had adequate remedies at law, where a coal company was expressly exempt by statute from having to pay a school district tax because it was already subject to taxation by the Commonwealth. The enabling act that gave the school district the authority to tax generally, expressly stripped from such local authorities the ability to levy, assess and collect any tax "on a privilege transaction, subject, occupation or personal property which is now or does hereafter become subject to a State tax or license fee." *Id.* at 759 (quoting Act of June 25, 1947, P.L. 1145, 53 P.S. §2015.1). Similarly, in *Barnes Foundation v. Keely*, 171 A. 267 (Pa. 1934) and *Pittsburgh, A. & M Ry. Co. v. Stowe Twp.*, 97 A. 197 (Pa. 1916), our Supreme Court upheld injunctions, again without discussing whether the plaintiffs would be irreparably harmed or if they had adequate remedies at law, against taxes that were levied despite express statutory language to the contrary. Specifically, in *Barnes*, the Supreme Court affirmed an injunction to restrain collection of city taxes levied on property found to be exempt as charitable. In *Pittsburgh A. & M.*, the Supreme Court held that where there is want of power to tax or tax is levied without authority of law, a bill in equity lies to restrain its collection.

The cases cited by plaintiffs are interesting and they do demonstrate that equity may be used to restrain the improper imposition of taxes. However, none of the cases cited by plaintiffs stand for the proposition that an equity plaintiff seeking to challenge a tax ordinance is exempt from the time-honored requirement of having to prove irreparable harm and lack of an adequate legal remedy simply because the challenger alleges that the taxing entity lacks authority to impose the tax. Further, the fact that an appellate decision does not specifically

mention a particular preliminary injunction requirement does not necessarily mean, as argued by plaintiffs, that the court has determined that the requirement is irrelevant or unnecessary to the issuance of preliminary injunctive relief. Accordingly, we found that plaintiffs' inferential argument was an unjustified stretch.

In any event, the cases on which plaintiffs rely are distinguishable from the case at bar. In the cases cited by plaintiffs, the taxing authority did not have the authority to levy the tax, the person or entity being taxed enjoyed an exemption, or the tax otherwise violated statutory provisions. Here, there is no statute that, generally speaking, denies defendant the ability to enact tax ordinances like the Amusement Tax. In fact, the Local Tax Enabling Act specifically authorizes townships of the second class to:

> ... in their discretion, by ordinance or resolution, for general revenue purposes, levy, assess and collect or provide for the levying, assessment and collection of such taxes as they shall determine on persons, transactions, occupations, privileges, subjects and personal property within the limits of such political subdivisions, and upon the transfer of real property, or of any interest in real property, situate within the political subdivision levying and assessing the tax, regardless of where the instruments making the transfers are made, executed or delivered or where the actual settlements on such transfer take place. The taxing authority may provide that the transferee shall remain liable for any unpaid realty transfer taxes imposed by virtue of this chapter.

53 P.S. §6924.301.1(a). Second-class townships do not, however, have the authority:

> [t]o levy, assess or collect an amusement or admissions tax on membership, membership dues, fees or

assessments, donations, contributions or monetary charges of any character whatsoever paid by the general public, or a limited or selected number thereof, for such persons to enter into any place, indoors or outdoors, to engage in any activities, the predominant purpose or nature of which is exercise, fitness, health maintenance, improvement or rehabilitation, health or nutrition education, or weight control.

53 P.S. §6924.301.1 (f)(13). In enacting the Amusement Tax, defendant, apparently fully aware of the limitations placed on second-class townships in the Local Tax Enabling Act, expressly exempted from taxation "fees charged for activities, the predominant purpose or nature of which is exercise, fitness, health maintenance, improvement or rehabilitation, health or nutrition education, or weight control." (Ordinance, §4(b)).

As the cited statutory provisions demonstrate, the township had the statutory authority to adopt the Amusement Tax, the passage of the ordinance was not an ultra vires act, the tax was neither illegal nor unlawful in the traditional sense of those terms, and no statutory exception or exemption applied to plaintiffs. An equitable challenge to a tax imposed by an entity that lacked authority to adopt or impose the tax, generally or as applied to a particular entity, person, or class, presents a much different scenario than a case where, as here, the taxing body had the power to impose a tax that is being challenged based on federal preemption and Commerce Clause concepts. For these reasons, the cases relied on by plaintiffs are factually and legally distinguishable and did not support the reduced burden that plaintiffs believe they enjoyed. Accordingly, we determined that plaintiffs needed to demonstrate they would be irreparably harmed and did not have adequate remedies at law. And we found that they did.

Plaintiffs argue in the alternative that because any refund would go to their customers, not to plaintiffs themselves, and because tracking down the individual customers would be "costly, time-consuming and difficult," there is "no realistic prospect of recovering money for [the] intended payees." Therefore, the harm is irreparable, and relief can only be found in the courts of equity. (Plaintiffs' reply and supplemental brief at 4)

The courts of equity are, of course, subject to statutory limitations. *Borough of Green Tree v. Board of Property Assessments, Appeals and Review of Allegheny County*, 328 A.2d 819, 823 (Pa. 1974). In fact, in 1806, the General Assembly mandated that statutorily-prescribed remedies were to be "strictly pursued." *Id.* (citing 46 P.S. §156). That is the route our courts have generally required litigants to take, but an exception exists when "the statutory remedy is pointless or inadequate." *Id.* at 824. Only when the moving party pleads facts demonstrating that the statutory remedy is inadequate will our courts entertain the possibility of allowing a party to proceed in equity. *Lashe v. Northern York County School Dist.*, 417 A.2d 260, 265 (Pa. Cmwlth. 1980). This remains true even when the party seeking to invoke the court's equity jurisdiction has made a direct frontal attack on the constitutionality of the local tax. *Green Tree*, 328 A.2d at 824; *Hudson v. Union County*, 413 A.2d 1148, 1150 (Pa. Cmwlth. 1980). A direct attack on the constitutionality of a tax will not alone invoke our courts' equity powers; rather, the direct attack must raise a "substantial question of constitutionality." *Hudson*, 413 A.2d at 1150.

Typically, when attacking the validity of a taxing ordinance promulgated under the Local Tax Enabling Act, the challenger will proceed under section 6 of the Act, which provides an express statutory avenue for such challenges. Under section 6, taxpayers representing

twenty-five percent or more of the total valuation of real estate in the political subdivision, or taxpayers numbering twenty-five or more aggrieved by the tax ordinance have the right to appeal. 53 P.S. §6924.309. Such an appeal must be brought within the thirty days between the adoption of the ordinance and the effective date. *Id.*

It is undisputed and clear from the record that plaintiffs do not represent twenty-five percent or more of the total valuation of real estate in the township, nor do they represent twenty-five taxpayers in number. It is also clear that plaintiffs represent only two of the four canoe liveries operating in Westfall Township. Additionally, because they do not open until mid-April of each year at the earliest, plaintiffs did not, within the statutory appeal period, have a combined total of twenty-five customers who could attack the ordinance. As a result, plaintiffs could not meet the requirements to file a statutory appeal and such an appeal was not a viable option for them. Accordingly, they sought remedies alternative to the Local Tax Enabling Act appeal process.

As is their right. Contrary to the position advocated by defendant, a section 6 statutory appeal is not the exclusive remedy for challenging a tax ordinance. The Pennsylvania Supreme Court has elucidated at least two non-exclusive alternative means by which the validity of a taxing ordinance may be attacked: an action for a refund and an action in equity.

The principal alternative is an action for a refund under 72 P.S. §5566b. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 278 (Pa. 1975). *See also Owen J. Roberts School Dist. v. Pickar*, 286 A.2d 14, 17 (Pa. Cmwlth. 1972) (holding that the failure of a taxpayer to initiate an appeal of an occupation tax under 53 P.S. §6924.309 did not preclude the petitioner from seeking a

refund under 72 P.S. §5556b). The failure to take an appeal under section 6 does not bar an action for a refund. *Wm. Penn*, 346 A.2d at 278.

Here, as plaintiffs have argued, an action for a refund would not be feasible. The facts and circumstances that demonstrate the lack of feasibility also further establish irreparable harm and the inadequacy of the refund remedy.

To begin, since plaintiffs operate seasonal businesses that do not open until mid-April, no admissions had been charged at the time we issued our April 8 order and no taxes had been collected and remitted to defendant. Simply, there was nothing to refund. Further, any taxes that plaintiffs might have collected and remitted to defendant under the Amusement Tax do not belong to plaintiffs. Those taxes would have been paid by plaintiffs' customers, and it is the customers who would be owed a refund. David Jones, the owner of Kittatinny Canoes, testified at the hearing that it would nearly impossible to track down every customer who strapped on a life jacket. In many instances, one member of a group will make a down payment on a river trip in advance, and another member of the group will pay the remaining balance. In other instances, one member of a group will make a single payment to cover the entire group and will, presumably, be repaid by the other members of the group. Though plaintiffs often record the name and address of the group member who physically pays for the trip, they do not record the name and address of every group member and would have no means of reaching every member of a group in order to issue a refund. Regardless of who pays, payments are often made with credit cards, which carry additional charges borne by plaintiffs when refunds are issued.

In addition, to accommodate this additional tax,

plaintiffs would be required to make costly changes to their computer software that keeps track of how much taxes need to be withheld from each admission paid. Currently, plaintiffs' software is only equipped to account for state sales tax, and it would require a costly overhaul to account for the Amusement Tax. In essence, as Mr. Jones testified, plaintiffs believe that the administrative cost of collecting, tracking, and remitting the tax, or any refund, would be more than the tax itself. In fact, simple math shows that the cost of postage would be almost the same as an individual refund. Amy Salvea, the general manager of Indian Head Canoes, likewise testified that making refunds would be an "administrative nightmare." The transactions are broken up multiple ways, Ms. Salvea continued, and it would be impossible to determine who was entitled to what. Under these facts and circumstances, we found that, like the statutory appeal option, an action for a refund was an inadequate legal remedy.

Without an adequate remedy at law, plaintiffs were left only with equity. Our Supreme Court has recognized actions in equity, under certain circumstances, including those present here, as another valid means of challenging the validity of a taxing ordinance. *Wm. Penn*, 346 A.2d at 279. This is a limited remedy and is only available when, as in this case, the statutory remedies are inadequate and irreparable harm may be shown.

As to plaintiff's invocation of equity, for all of the reasons discussed under this heading, we found that the lack of an adequate legal remedy, coupled with the cost to plaintiffs of collecting, remitting, and refunding the tax, the administrative, logistical, and practical problems of refunding the tax, and the fact that plaintiffs and their customers would be subject to a tax that, as discussed below, is in all likelihood preempted, combined to at once justify invocation of this court's equitable jurisdiction and

demonstrate the irreparable harm/no adequate remedy at law requirement had been satisfied.

## Likely to Prevail on the Merits

We next turn to the question of how likely it is that plaintiffs will prevail on the merits of their claims that the Amusement Tax is preempted by federal law and violates the Commerce Clause of the United States Constitution. After careful consideration of this issue, we found that plaintiffs have a strong likelihood of prevailing on the merits.

In regard to preemption, plaintiffs argue that 33 U.S.C. §5(b), which prohibits the taxation of any watercraft operating on the navigable waters subject to the authority of the United States, preempts the Amusement Tax.[4] While several exceptions exist to the general rule under 33 U.S.C. §5(b), plaintiffs argue that none apply in the present case and that the plain language of the statute is clear, unambiguous and free of doubt.

Defendant counters by directing the court's attention to the legislative history of 33 U.S.C. §5(b), particularly the history related to amendments made in the wake of the September 11, 2001, terrorist attacks. Defendant insists Congress amended the statute to prohibit the taxation of watercraft on navigable waters "to detect and deter a potential 'transportation security incident.'" Such an occurrence upon the portion of the Delaware River that flows past Westfall Township, defendant continues, is "unimaginable." (Def.'s post-hearing br. at 6.) In furtherance of its argument, defendant attempts to draw a factual distinction between this case and three other cases, two in Tennessee and one in Fayette County,

---

4. At the hearing, the parties agreed that the Delaware River is a navigable water subject to the authority of the United States.

where local tax ordinances were held to be preempted by 33 U.S.C. §5(b). In each of those cases, the local tax ordinance expressly and specifically taxed watercraft operating on navigable waters of the United States. The Amusement Tax, defendant argues, is distinct because it taxes generally the admissions to amusements on "dry land." (Def.'s post-hearing br. at 7.) Likewise, defendant argues plaintiffs cannot demonstrate they are likely to prevail on the merits of their claim that the Amusement Tax violates the Commerce Clause of the United State Constitution. Specifically, defendant argues that plaintiffs have not shown — in fact, have not even pled — that the Amusement Tax discriminates against or unduly burdens interstate commerce.

Finding defendant's arguments unavailing, we believe that, because the Amusement Tax fails to meet the statutory exceptions outlined in 33 U.S.C. §5(b), it stands in direct "irreconcilable conflict" with 33 U.S.C. §5(b). Therefore, we believe the Amusement Tax, as applied to plaintiffs as the owners and operators of canoe liveries on the Delaware River in Westfall Township, would likely be found to be preempted by federal law in a final decree and would thus be found void.

In *Kiak v. Crown Equip. Corp.*, 989 A.2d 385 (Pa. Super. 2010), our Superior Court outlined the standard to be applied in federal preemption cases:

Federal preemption is a jurisdictional matter for a state court because it challenges subject matter jurisdiction and the competence of the court to reach the merits of the claims raised. *Werner v. Plater-Zyberk*, 799 A.2d 776, 787 (Pa. Super.2002). The principle of federal preemption of state law derives from the second clause of Article VI of the United States Constitution's Supremacy Clause, which provides that the laws of the

United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, laws that are in conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725 (1981).

"Congress has the undisputed power to preempt state law in areas of federal concern." *Stone Crushed P'ship v. Jackson*, 908 A.2d 875, 880 (Pa. 2006). In determining the breadth of a federal statute's preemptive effect on state law, courts are guided by the tenet that "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). However, "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action." *Medtronic, Inc.*, 518 U.S. at 485. From this premise, the Supreme Court has relied upon an "assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

The presumption against federal preemption of state law is one of "dual jurisdiction" which "results from reasons of comity and mutual respect between the two judicial systems that form the framework of our democracy." *Fetterman v. Green*, 689 A.2d 289, 292 (Pa. Super. 1997) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) and *Michael v. Shiley, Inc.*, 46 F.3d 1316 (3d Cir. 1995)). The Commonwealth Court has explained, "[t]here is no hierarchical arrangement between state courts and federal courts that exercise jurisdiction within that state. Under the federal system,

the states possess sovereignty concurrent with that of the federal government." *Werner*, 799 A.2d at 788 (quoting *City of Philadelphia v. Pennsylvania PUC*, 676 A.2d 1298, 1309 n. 10 (Pa.Cmwlth.1996)).

Congress's intent to preempt state law may be express or implied and found in any of three ways:

First, state law may be preempted where the United States Congress enacts a provision which expressly preempts the state enactment. Likewise, preemption may be found where Congress has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law. Finally, a state enactment will be preempted where a state law conflicts with a federal law. Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law [ ] or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Stone Crushed P'ship*, 908 A.2d at 881 (2006) (citations omitted).

*Kiak*, 989 A.2d at 390-92.

Section 5 of Title 33 of the United States Code was originally enacted in 1884 and prohibited the levying of tolls or operating charges upon any watercraft that passed through a lock, canal or canalized river owned by the United States. 33 U.S.C. §5(a). Following the terrorist attacks of September 11, 2001, §5 was amended by the Maritime Transportation Security Act of 2002 ("MTSA"), a comprehensive overhaul of the Merchant Marine Act of 1936 with the stated purpose of establishing "a program to ensure greater security for United States seaports, and for other purposes." Scores of statutes were amended by

the MTSA, including 33 U.S.C. §5. A second subsection, §5(b), was added and reads in full:

(b) No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for

(1) fees charged under section 2236 of this title;

(2) reasonable fees charged on a fair and equitable basis that —

(a) are used solely to pay the cost of a service to the vessel or water craft;

(b) enhance the safety and efficiency of interstate and foreign commerce; and

(c) do not impose more than a small burden on interstate or foreign commerce; or

(3) property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution.

33 U.S.C. §5(b).

This language represents the entirety of §5(b) and there is nary a mention of preemption, let alone a provision that expressly preempts an enactment of a tax on watercraft operating in navigable waters by a state or local government. However, the statute provides a clear mandate that "[n]o taxes...shall be levied upon or collected from" vessels

or watercraft operating on navigable waters of the United States. Absent an express provision declaring invalid any state or local taxes on watercraft operating on navigable waters, Congress could scarcely have been more clear about its intention to deny state and local governments the ability to levy taxes on watercraft operating on navigable waters. The language of the statute is clear, and such plain language deserves to be given its full meaning.

Congress did provide for three exceptions to this general command, though defendant has not argued that any apply in the instant case. The first exception allows for fees to be charged under 33 U.S.C. §2236, which permits non-federal interests to levy port or harbor dues on vessels engaged in trade entering or departing from a harbor. This exception has no application here. The Amusement Tax does not fit under the second or third exceptions, either. The second exception permits fees to be collected for the sole purpose of paying the cost of service to a vessel or watercraft, while the third exception permits the collection of property taxes on vessels or watercraft. 33 U.S.C. §§5(b)(2)(a), 5(b)(3). As previously discussed, the stated purpose behind the implementation of the Amusement Tax was "to increase general revenues within the Township for providing residents with essential services." (Ordinance, §3). This stated purpose fails to comport with the second and third exceptions outlined in 33 U.S.C. §5(b), and it would appear, based on a plain reading of the statute and its exceptions, that Congress intended to preempt taxes such as the Amusement Tax.

As outlined by the United States Supreme Court and our Superior Court, preemption may also be found where a state or local law stands in direct "irreconcilable conflict" with a federal law. *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 31 (1996). "Compliance with both statutes, for example, may be a physical impossibility, or, the state

law may stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotations and citations omitted).

In both *Moscheo v. Polk County*[5] and *High Country Adventures, Inc. v. Polk County*,[6] the Court of Appeals of Tennessee held that it was a physical impossibility for the plaintiffs to comply with both the local tax, which was similar to the tax involved in this case, and 33 U.S.C. §5(b). In *High Country*, a case decided nearly a year before *Moscheo*, a Tennessee whitewater rafting venture challenged the same Polk County privilege tax at issue in *Moscheo*. Much of the *High Country* case was focused on whether the plaintiff had standing to bring such a challenge. After determining the plaintiff had standing to challenge the ordinance, the court of appeals then considered whether the Polk County tax was preempted by 33 U.S.C. §5(b). The Tennessee court had little trouble finding that the tax was preempted, holding that:

It is beyond dispute that there is a manifest conflict between Polk County's local privilege tax which levies a tax on a consumer participating in rafting excursions on navigable waters in the county and requires collection of the tax operator of such excursion, and [33] U.S.C. §5(b), which prohibits the levying and collection of a tax from any vessel or water craft operating on navigable waters subject to the authority of the United States or from its passengers or crew. The conflict is "irreconcilable," and compliance with both laws is a physical impossibility.

*Id.* at *13. The Tenessee Court of Appeals reaffirmed

5. No. E2008-01969-COA-R3-CV, 2009 WL 2868754 (Tenn. Ct. App. Sept. 2, 2009).
6. No. E2007-02678-COA-R3-CV, 2008 WL 4853105 (Tenn. Ct. App. Nov. 10, 2008).

its holding in *Moscheo*, finding "that based upon the inescapable conflict between the [privilege tax] and 33 U.S.C. §5(b), the [privilege tax] is preempted by 33 U.S.C. §5(b)." *Moscheo*, 2009 WL 2868754 at *16.

The holdings in *High Country* and Moscheo are in accord with the decision in *Borough of Ohiopyle v. Wilderness Voyagers, Inc.*, No. 220 Civil 2005 G.D. (C.P. Fayette, filed August 30, 2005), the only Pennsylvania case to address the issue that was brought to our attention by the parties or that our own research uncovered. In *Wilderness Voyagers*, the Court of Common Pleas of Fayette County considered whether a local tax ordinance that placed a tax upon the rental fee for the furnishing or use of any type of watercraft "in or over any stream or body of water" in the Borough of Ohiopyle, Pennsylvania, through which the Youghiogheny River flowed, was preempted by 33 U.S.C. §5(b). Based on a plain reading of 33 U.S.C. §5(b), our sister court found that the Youghiogheny was under federal jurisdiction and therefore the borough was precluded from levying a tax on the use of the river. *Wilderness Voyagers*, at *4.

Here, too, there exists an "irreconcilable conflict" between the Amusement Tax and 33 U.S.C. §5(b). The Amusement Tax requires operators of amusements in Westfall Township to collect a one percent tax on admissions charged and the gross amount collected where no fixed admission is charged, including admissions charged from the rental of kayaks, canoes, rafts and other watercraft for use on the Delaware River, a navigable water. Section 5(b), however, prohibits the levying and collection of taxes by a non-federal interest from watercraft operating on any navigable waters subject to the authority of the United States. While it is not a physical impossibility for plaintiffs to comply with both statutes, since plaintiffs are not in a position to enact tax ordinances but can certainly

remit taxes, the Amusement Tax stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The plain language of 33 U.S.C. §5(b) is clear, and apart from the three exceptions, none of which apply to the facts presented here, no taxes may be levied upon or collected from watercraft operating on the Delaware River, a navigable water. We need look no further to glean the full purpose and objective of Congress in enacting §5(b). We do recognize and respect the presumption against federal preemption of state and local law, but we cannot, as the Tennessee court could not, ignore the "obvious and inescapable conflict between the local tax and the federal prohibition." *High Country*, 2008 WL 4853105 *13. This blatant conflict alone is enough to overcome the presumption and support our holding that the Amusement Tax, as applied to plaintiffs as owners and operators of canoe liveries on the Delaware River in Westfall Township, is preempted by 33 U.S.C. §5(b) and is void.

"Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)). "When the words of a statute are clear and unambiguous, there is no need to look beyond the plain meaning of the statute under the pretext of pursuing its spirit. *Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1201 (Pa. 2009) (citing 1 Pa.C.S.A. §1921(b)).

Defendant also insists that, despite the plain language of 33 U.S.C. §5(b), the legislative history of the MTSA, which created §5(b), is illustrative of Congress' true intentions. And those intentions, defendant continues, had

nothing to do with preemption. Instead, defendant argues, the MTSA was enacted "to detect and deter a potential 'transportation security incident,' which Congress defined as a 'security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area.'" *Cassidy v. Chertoff*, 471 F.3d 67, 70 (2d Cir. 2006) (quoting 46 U.S.C. §70101(6)).[7] Defendant contends that such an occurrence on the section of the Delaware River in question, particularly in a canoe or raft, is unimaginable. Though ultimately unavailing, defendant is not the first to present such an argument.

The Court of Appeals of Tennessee considered the identical argument in *Moscheo*. In that case, the plaintiff challenged a local tax ordinance that imposed a $2.50 tax on rafting trips in Tennessee's Ocoee River. There, too, the plaintiff asserted that the local tax ordinance was preempted by 33 U.S.C. §5(b), as the Ocoee River was a navigable water and the tax, which was assessed on passengers on a vessel or watercraft on a navigable water, did not meet any of the exceptions outlined in 33 U.S.C. §5(b). *Id.* at *3. In response, the defendant county argued, as the township has argued in this case, that "absent clearly expressed intent by Congress to preempt existing law, preemption should not be implied." *Id.* at *4.

The Tennessee court examined the MTSA, identifying its purpose and spelling out eleven of the thirteen findings that Congress made and included in the MTSA, none of which related to whitewater rafting. *Id.* at *13-14. The purpose statement and the findings all pointed to the

_____

7. We must note that, in quoting this portion of *Cassidy* in its brief in opposition, defendant included as part of the block quote, "The legislative history of the MTSA does not support preemption." Nowhere in *Cassidy* does this quote appear. We trust that this statement was defendant's own argument, and its placement within the block quote was a typographical error and not an attempt to deceive the court.

idea that United States ports are vulnerable to breaches in security and it was necessary to secure entry points and other areas of port facilities and inspect containers in order to increase security. *Id. See also* 46 U.S.C. §70101. The Tennessee court then drew a parallel with *Cassidy*, in which the plaintiffs contended that even if the government had a "special need" under the MTSA, the government did not need to protect ferries on Lake Champlain, where there is no obvious terrorist threat. *Id.* at *14 (citing *Cassidy*, 711 F.3d at 83). The Second Circuit rejected this argument, holding that "the government, in its attempt to counteract the threat of terrorism, need not show that every airport or every ferry terminal is threatened by terrorism to implement a nationwide security policy." *Cassidy*, 711 F.3d at 83. The Tennessee court agreed "with the reasoning of this holding. While the Ocoee River seems to be a remote terror target, the federal government is not required to demonstrate how every navigable waterway subject to its authority might be subjected to acts of terrorism in order to implement its nationwide security policy." *Moscheo*, 2009 WL 2868754 at *14. Substitute "Delaware River" for "Ocoee River" and scant more needs be said. Through the MTSA, Congress need not have demonstrated how the portion of the Delaware River that flows past Westfall Township might fall prey to acts of terrorism for that portion not to fall under the purview of 33 U.S.C. §5(b).[8]

While we recognize that the *Moscheo* and *High Country* opinions are unpublished decisions from a Tennessee appellate court and are not even binding on Tennessee

---

8. Additionally, as noted, the MTSA is an overwhelming and comprehensive act that amended scores of statutes, a predominant number of which are contained in Title 46 of the United States Code, which constitutes the bulk of federal maritime law. The amendment to 33 U.S.C. §5 constituted a fraction of the changes the MTSA made to the United States Code, and it was hardly Congress' main focus as it worked to craft and enact the MTSA and put into effect the overriding purpose of the MTSA in its broad-reaching entirety.

trial courts, let alone a Pennsylvania trial or appellate court, a dearth of case law exists interpreting or otherwise analyzing 33 U.S.C. §5. And simply because these cases, as well as *Wilderness Voyagers*, are not binding on our court, that does not mean we cannot turn to them for guidance when considering a nearly identical issue, particularly when there is so little state or federal case law and we find the cases to have been properly decided and the rationale expressed by the appellate court in Tennessee and our sister court in Pennsylvania to be persuasive.

Apart from arguing the asserted inapplicability of these cases, defendant attempts to distinguish the rulings by the Court of Appeals of Tennessee and the Court of Common Pleas of Fayette County. Defendant contends these cases are distinct from the case at bar because the ordinances in the Tennessee and Fayette County cases expressly taxed the rental or admission fees associated with the use of canoes, rafts or other watercraft. The Amusement Tax, however, taxes the admission to "amusements" on "dry land" generally and neither specifically targets nor applies only to apply to watercraft on the Delaware River. While we found this to be an intriguing argument, we ultimately determined it to be a distinction without a difference. Further, we reiterate that we believe 33 U.S.C. §5(b) would be found, in a final decree, to preempt the Amusement Tax only as the Amusement Tax applies to Plaintiffs as owners and operators of canoe liveries on the Delaware River in Westfall Township, and not to other providers or even to plaintiffs if they charge for other amusements on land now or in the future. *See generally Burkholder v. Zoning Hearing Bd. of Richmond Twp.*, 902 A.2d 1006, 1007 (Pa. Cmwlth. 2006) (holding the federal Nutrient Management Act and its implementing regulations preempted the local zoning setback requirement *as applied* to both of petitioners' proposed structures); *Twp. of Derry v.*

*Pennsylvania Dep't of Labor & Indus.*, 940 A.2d 1265, 1269 (Pa. Cmwlth. Ct. 2008) (finding a federal regulation, *as applied*, preempts Derry Township's ability to grant permits and receive fees for construction and occupancy of buildings within its confines). We do not hold that it is likely that 33 U.S.C. §5(b) preempts the Amusement Tax in the Amusement Tax's applications beyond the scope of canoe liveries operating on the Delaware River in Westfall Township.

Even if we were to completely disregard this plain meaning versus legislative history debate, we would still have little choice but to find that the Amusement Tax is preempted by federal law. As stated above, the third way by which preemption may be found is when Congress "has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law." *Kiak*, 989 A.2d at 392 (internal citations omitted). "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 132 S. Ct. 2492, 2502 (2012).

As previously discussed, 33 U.S.C. §5 was originally enacted under the Rivers and Harbors Act of 1884. The Rivers and Harbors Act of 1884 itself was enacted fifty years after the first act of its kind, the Rivers and Harbors Act of 1824, which came on the heels of the landmark decision of *Gibbons v. Ogden*, 22 U.S. 1 (1824). Since the United States Supreme Court declared that the power to regulate the use of navigable waters rests solely with the federal government some 189 years ago, *id.* at 22, Congress has passed scores of Rivers and Harbors Acts. Each of these acts has in some way dealt with the navigable waters of the United States, some authorizing appropriations for the development of canals or the improvement or repair of

rivers or harbors.[9] Others have been concerned with the construction of dams or the prevention of private dams being placed on navigable waters without the approval of the federal government,[10] or have tightened restrictions on unauthorized restrictions to navigation.[11] These acts have also created interstate compacts, such as the one between Pennsylvania and New Jersey that facilitated the creation of the Delaware River Joint Toll Bridge Commission.[12] Many, if not most or all, of the various Rivers and Harbors Acts can be found in Title 33 of the United States Code, which is entitled "Navigation and Navigable Waters" and is devoted in its entirety to federal regulation of, as its name suggests, the navigable waters of the United States. The subjects covered by Title 33 are wide-ranging and far-reaching, from Navigable Waters Generally to Navigation Rules for Harbors, Rivers, Inland Waters Generally to Regulations for the Suppression of Piracy to Clean Hulls. Through the Rivers and Harbors Acts and the vast array of other statutes found under Title 33, Congress has made clear, however implicitly, that the states are foreclosed from regulating the navigable waters of the United States. And "[w]here Congress occupies an entire field ... even complementary state regulation is impermissible." *Arizona*, 132 S.Ct. at 2502.

Believing strongly that the Amusement Tax is preempted by federal law and therefore would likely be found void in a final decree, we need not address whether the Amusement Tax violates the Commerce Clause of the United States Constitution. "When faced with an issue raising both constitutional and non-constitutional questions, we must make a determination on non-constitutional grounds if

---

9. River and Harbor Act of 1886, 24 Stat. 310; River and Harbor Act of 1954, Title 1 of Pub. L. 83-780.

10. River and Harbor Appropriation Act of 1899, 30 Stat. 1121.

11. River and Harbor Act of 1890, 26 Stat. 426.

12. River and Harbor Act of 1935, Pub. L. 74-409.

possible and avoid the constitutional question." *Com. v. Kennedy*, 604 A.2d 1036, 1038-39 (Pa. Super. 1992).

## Summary and Synthesis

In sum, this is a case where plaintiffs seek to restrain and then permanently enjoin a municipal tax that appears to clearly be preempted by federal law. For the reasons discussed, plaintiffs have established the requirements for a preliminary injunction, including the irreparable harm and inadequate remedy at law element. In this regard, contrary to the township's assertion, a statutory appeal under section 6 of the Local Tax Enabling Act is not the exclusive means by which to challenge a local tax ordinance. In any event, Plaintiffs could not physically, practically, or legally have satisfied the qualifications to file such an appeal, for themselves or their prospective customers, within statutory time frames. As a result, they did not truly have a feasible statutory remedy and, in any event, equity should not leave a party without a remedy. Further, given the facts and circumstances of this case, especially the nature of the canoe livery operations of both plaintiffs, neither the statutory appeal nor refund processes constitute adequate remedies at law. The lack of legal remedies combines with the other facts and circumstances of this case to justify the need for equity jurisdiction and establish the requisite level of harm. Finally, for the reasons discussed in the last section of this opinion, there is a strong likelihood that plaintiffs will prevail on their preemption argument, and therefore, be entitled to the permanent declaratory and injunctive relief that they request.

It is for these reasons that we granted the preliminary injunction.